UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JAMES M. PLASSE<br>　　　　Plaintiff | )<br>)<br>) |
| vs. | )　　Civil Action No. 04-CV-30056-MAP<br>) |
| TYCO ELECTRONICS<br>CORPORATION,<br>　　　　Defendant | )<br>)<br>) |

## PLAINTIFF'S OPPOSITION TO
## DEFENDANT'S MOTION TO DISMISS

Defendant has moved to dismiss the complaint based on its allegations that the plaintiff gave "repeated and willful false deposition testimony" and fabricated a document. Plaintiff opposes the motion as baseless and frivolous.

## STATEMENT OF FACTS

Plaintiff brought this complaint challenging the termination of his employment as a violation of public policy and in contravention of promises made by the employer (Complaint). Plaintiff was employed by the defendant as a controller. During his tenure he continuously brought to the attention of several supervisors multiple fraudulent financial and accounting practices at Tyco (See, e.g. Def. Exh. 2, pp. 58-75, 125-126, 207). This included practices such as billing clients for products not delivered, double counting as revenues items which had been shipped and returned, and billing clients before product was shipped to give the appearance of higher revenue (Def. Exh. 2, pp. 58-75). The effect was to substantially overstate the actual

1

revenues of the company. Plaintiff allegations were supported by numerous e-mails which he produced evidencing internal disputes over those objections (See e.g. Def. Exh. 2, pp. 113, 122). At the time these events occurred the defendant had achieved a considerable public reputation for fraudulent and unethical corporate conduct.

Plaintiff was terminated for allegedly informing his subordinates that they might not get a raise, a charge he denies (Def. Exh. 2, pp. 165-180), and concerning which no independent evidence has been produced. In a transparent attempt to turn the tables on the plaintiff, the defendant brought this motion accusing him of "fraud on the court," a charge largely based on the defendant's own speculation, and not supported by the record.

The entire dispute at issue concerns a document (one version of the plaintiff's resume) which the *plaintiff* produced to the defendant as part of its automatic disclosure (Pl. Exh. 1). Plaintiff's counsel had, among other papers given him by the plaintiff, a copy of a resume which counsel produced to defense counsel, as it seemed a potentially relevant document. This resume, which states that the plaintiff has an MBA as opposed to "Pursuing MBA/Candidate" (the language on the resume the plaintiff testified he gave to the employer), was, therefore, voluntarily provided to the defendant prior to plaintiff's deposition and prior to any knowledge of any dispute about the resume. It was this document which the defendant used to question the plaintiff at his deposition about his resumes (Def. Exh. 2, pp. 11-13). At the time the plaintiff, obviously confused, testified that while he may have given this resume to counsel, it was not the resume he had knowingly given to employers, although some recruiters had urged him to do so (Def. Exh. 2, pp. 11-13). At this point in time the plaintiff had also provided counsel with a copy he had of his personnel file. That file did not contain any resume at all (Def. Exh. 2, pp. 266-

2

268). Having been questioned about his resume at the first day of his deposition, the plaintiff searched his documents at home and discovered a copy of a fax (together with a resume) which he had faxed to the defendant prior to his hire (Def. Exh. 6). That resume said "Pursuing MBA/Candidate" (Def. Exh. 6). The original document is presently held by plaintiff's counsel and the defendant has not asked to examine it. An MBA was *not* a requirement for the position Mr. Plasse applied for and obtained.

Defendant contends that the fax and the attached resume were recently fabricated by the plaintiff. The only evidence presented for this extremely serious charge is the affidavit from a recent record keeper as to the contents of Mr. Plasse's personnel file (Def. Exh. 1). The thrust of the affidavit is that there was a resume in the personnel file which she attached. That resume says "MBA". This evidence is contradicted in multiple ways. First, when the plaintiff requested and received his personnel file, it contained no resume at all (Def. Exh. 2, pp. 266-268). Secondly, even though Ms. Ayala testified in her sworn affidavit that she made only two identical "true" copies of the personnel file resume, incredibly the defendants themselves present three different versions of the personnel file resume for this motion in Def. Exh. 1 and Def. Exh. 4. Defendant's Exhibit 1 is an affidavit from Maryann Ayala who states that she made two "true" copies of the same personnel file and that the documents in Exhibit 1 are those true copies. In Exhibit 1, the copy of the July 26, 2000 cover letter is dark and smaller than usual in size, and has two handwritten notes on it (Pl. Exh. 2). The resume attached to Def. Exhibit 1 is similar in size and darkness, has no writing on it, and has three vertically arranged business cards attached to it (Def. Exh. 1; Pl. Exh. 2). Ms. Ayala testifies that she made the same copy for counsel (Def. Exh. 1, p. 2). Defendant's Exhibit 4 is Exhibit 15 from Mr. Plasse's deposition. It was

introduced at the deposition as a resume from Mr. Plasse's personnel file (Def. Exh. 2, pp. 266-268, 335, 336). The resume at p. 15-40 and p. 15-41 of this exhibit is noticeably larger and brighter than the Def. Exh. 1 resume and Defendant's Exhibit 1 has handwriting scrawled on it (Def. Exh. 4, pp. 15-40, 15-41; Pl. Exh. 3). It is followed at pp. 15-44 by a different version of the cover letter which has only one handwritten notation on it, as opposed to two notations on the other version (Pl. Exh. 3; Def. Exh. 4, pp. 15-46). At pp. 15-46 and pp. 15-47 is still another resume copy which has *no* handwriting on it (Def. Exh. 4, pp. 15-46). It is followed at pp. 15-47 by a *fourth* version of the cover letter, this time with the business cards, copied onto the cover letter as opposed to appearing separately in the other versions (Def. Exh. 1; Pl. Exh. 4).

Therefore, Defendant presents a sworn affidavit in this matter that Tyco had only one version of Mr. Plasse's resume and cover letter, yet in the very same motion, produces *three different* versions, all said to be from one copy in the same personnel file. To add to this, the original personnel file produced to the plaintiff prior to the litigation, contained *no resume* at all (Def. Exh. 2, pp. 266-268). When plaintiff's counsel raised this very point at the deposition and asked to see the personnel file in use at the deposition, *defense counsel refused* to show it (Def. Exh. 2, pp. 266-268). When the plaintiff was later asked to compare the resume he claimed he had sent (Def. Exh. 6) with the Deposition Exhibit 15 personnel file copy he was being shown, *defense counsel refused* to show it to him (Def. Exh. 2, pp. 335-336).

This is consistent with the plaintiff's testimony that he may have sent more than one resume, that defendants may have lost one of his resumes and asked for another, or that a recruiter could have sent a resume that contained the false information (Def. Exh. 2, 333-339).

All of this concerns an issue of no real relevance: an MBA was not required for the

4

position and the defendant makes no claim to have relied on Mr. Plasse's "MBA" as a reason for hiring him. Mr. Plasse testified that he told his future boss and the man who interviewed him, Thomas Hanbert, the truth about his educational status (Def. Exh. 2, p. 255). Defendant produces no contrary testimony from Mr. Hanbert or from anyone responsible for hiring the plaintiff. Nor does the defendant produce any testimony from the recipient of the resumes, Leslie Lake. Defendant produces only the second-hand information of a record keeper, whose affidavit is contradicted by the defendant's own attached exhibits.

This is the reason plaintiff's counsel suggested to defense counsel that there was more evidence that the defendant engaged in document fraud than that the plaintiff had. This was not a cavalier comment, but an accurate reflection of the record.

## ARGUMENT

### I. Defendant's Allegations Are Baseless And There Are No Grounds For Dismissal

Defendant has brought a dispositive motion seeking to dismiss this case on the basis of what are, at a minimum, hotly disputed facts concerning a peripheral, non-material issue. As noted above, defendant's evidence itself, on its face, is contradictory and shows that there are disputed issues of material fact. Plaintiff has denied under oath that he forged any document (Def. Exh. 2, p. 270-271). The entire dispute arose after *plaintiff* voluntarily produced to the defendant a version of his resume that was not accurate[1]. Asking the court to dismiss this case

---

[1] It should also be noted that when questioned about this resume at the start of his deposition, before he could have known there would be any dispute, Mr. Plasse said he did not have an MBA degree and that this was not a resume that he had sent to Tyco. (Def. Exh. 2, pp. 11-13).

5

and assess sanctions on the basis of this flimsy and disputed evidence is frivolous. No one could reasonably claim that there is not, at a minimum, a disputed issue of fact, and indeed, the weight of the evidence is, if anything, against the defendant. Defendant does not even ask for an evidentiary hearing, but has forced the plaintiff's counsel to expend many hours of time to defend, and burdened the court with, a dispositive motion which could not possibly meet the standard required for a dismissal.

The cases cited by the defendant stand in marked contrast to this one. In *Aoude v. Mobil Oil Corp.*, 892 F2d. 1115 (1st Cir. 1989) the court held that dismissal was an "extreme" remedy and not to be "lightly engaged":

> "where it can be demonstrated clearly and convincingly that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense."
>
> *Aoude*, at 1118

In *Aoude* the court found clear and convincing evidence because the party *admitted* fabricating a bogus purchase agreement, which went to the heart of the case. *Aoude* at 1116-1117. In *Premium Homes and Land Corporation v. Cheswell, Inc.*, 240 F. Supp. 2d 97 (D. Mass. 2002), the plaintiff *admitted* fabricating an e-mail that was a document that "formed the core of Premier's claim". *Premier* at 98-99. In *Rockdale Management Co. v. Shawmut Bank*, 418 Mass. 596, 638 N.E. 2d, 29 (1994), the plaintiff *admitted* forging a letter to prove damages. *Rockdale* at 598-599. And in *Munshani v. Signal Lake Venture Fund, II, LP*, 60 Mass. App. Ct.

6

714 (2004) an e-mail was presented to remove a claim from the Statute of Frauds. *Munshani* at 716. After a claim of forgery, the court appointed an expert to investigate while the plaintiff maintained authenticity. When the expert concluded there was a forgery, the plaintiff took the Fifth Amendment in response. *Munshani* at 716-717. All of these cases involve both material, core issues and admitted fraud. In this case the allegation is based on flimsy, contradictory evidence and it concerns a peripheral issue.

Defendant asserts that if there had been a misrepresentation, it would entitle the defendant to dismissal. Even while asserting this proposition, the defendant admits that Massachusetts courts have refused to hold that after acquired evidence could be used to dismiss a wrongful termination case. *Flesner v. Technical Communications Corp.*, 410 Mass. 805, 815-817 (1991)[2]; *Prozinski v. Northeast Real Estate Services, LLC*, 59 Mass. App. Ct. 599, 610-612 (2003).

Even if the defendant could show it had "after acquired evidence" of resume fraud, there is no reason to believe it would be grounds to dismiss the case and bar liability based on cases outside Massachusetts. *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352 (1995) stands firmly for the proposition that after acquired evidence only affects the remedy and does not bar liability. *McKennon* at 358. Beyond this, defendant can only cite cases where a few states have held that after acquired evidence could bar liability in breach of contract claims, not claims for discharge in violation of public policy. *Lewis v. Fisher Service Co.*, 495 S.E. 2d 440,

---

[2] Notably, the court in *Flesner* chides the defendants for raising the issue in a summary judgment context when the underlying facts were clearly disputed and there was "at the very least" a dispute as to whether it would have caused Flesner's discharge. *Flesner* at 815-816. Here all the underlying facts are disputed and defendants present no evidence at all that they would have terminated Mr. Plasse, or that any Tyco employee had ever been terminated for this reason.

444 (S.C. Sup. Ct. 1998); *Crawford Rehabilitation Services, Inc. v. Weissman*, 938 P. 2d 540 (Cal. Sup. Ct. 1997). For instance, in citing *McDill v. Enviroamics Corp.*, 757 A.2d 162 (N.H. 2000) defendant neglects to note that the court held that after acquired evidence could *not* be used to bar liability for a tort action for wrongful termination such as the present case. *McDill* at 166 and *See O'Day v. McDonnell Douglas Helicopter Co.*, 191 Ariz 535, 959 P. 2d 792, 797 (1998) (employee still entitled to a remedy as a result of employer's tortious conduct). Even in *Lewis v. Fisher Service Co.*, 495 S.E. 2d 440 (S.C. Sup. Ct. 1988) the court held that there could be a bar to liability in a breach of contract case only where there was clear and convincing evidence that the employee engaged in activity "of such severity" they would have been terminated on those grounds alone. *Lewis* at 445.

Here, even if the *Lewis* standard applied to the causes of action in this case, there is no clear and convincing evidence plaintiff did anything wrong. Defendant presents only contradictory evidence from a record keeper as to the content of his personnel file: evidence flatly contradicted by the plaintiff and by other "copies" of the file.

Defendant's citation to *Guzman v. United Airlines*, 53 Fair Empl. Prac. Cases, 1419 (D. Mass. 1990) is inapposite. *Guzman* held that an employee could not meet an essential element of a G.L. c. 151B discrimination claim, that he was qualified, because it later turned out that he had concealed medical evidence which would have disqualified him. *Guzman* at 1422. Here there is no evidence and no suggestion that plaintiff was not qualified: there is no dispute that an MBA was not a qualification for the job of controller.

The motion is utterly without merit and should be denied.

THE PLAINTIFF, JAMES PLASSE
BY HIS ATTORNEY

*/s/ Maurice M. Cahillane*
Maurice M. Cahillane, Esq., BBO# 069660
EGAN, FLANAGAN AND COHEN, P.C.
67 Market Street - Post Office Box 9035
Springfield, MA 01102
(413) 737-0260; Fax: (413) 737-0121

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served this 17th day of February, 2005, on all parties, by First Class Mail, postage prepaid, to:

Jeffrey D. Clements
Clements & Clements, LLP
50 Federal Street
Boston, MA 02110

*/s/ Maurice M. Cahillane*
Maurice M. Cahillane

11094-030300\84912.wpd

9

# CONFIDENTIAL RESUME
## James M. Plasse
19 Hillary Lane, Westfield, MA 01085
Home (413)-562-8708, Work (860)-684-5881 Ext. 202



**Experience:**

| | |
|---|---|
| August 2000 To Present | **Tyco Electronics, Printed Circuit Group, LLP, Stafford, CT 01075** <br> Division of Tyco International, Ltd.   (ISO 9002 Certified) <br> *Controller, Stafford CT, Manchester CT, and San Diego CA, Divisions* |

- Responsible for the management and direction of all Finance functions, comprising General Accounting, Cost Accounting, Accounts Payable/Receivable, Payroll, Credit and Collections, and Purchasing for three divisions of Tyco Electronics / Printed Circuit Group with sales of $150 million and $1.5 billion consolidated.
- Oversee all aspects of financial reporting including the preparation of financial and operational reporting to internal management including the company's Board of Directors and Audit Committee.
- Coordinate and facilitate the development of annual business plans, strategic planning process, budgeting, forecasts, capital, cash management, taxes, and banking relationships in a manner designed to meet planned EBIT, DSO, and DII targets.
- Ensure financial controls, policies and processes are in compliance to provide accurate financial reporting in accordance with GAAP, corporate standards and SEC requirements including quarterly SEC financial reporting.
- Oversee the month-end closing process, monthly consolidated financial statements, monitor capital and operating budgets for variance to plan, support the annual audit and other special requests.
- Review and recommend acquisition and divestiture opportunities for the division. Coordinate the finance and accounting due diligence activities for acquisitions of complementary businesses and product lines.
- In conjunction with other Senior Management, foster financial leadership, efficiency, systemization and discipline throughout the organization.
- Involved in developing, modifying, and executing company policies that affect immediate operations and profit objectives.
- As Controller, served as the senior financial executive and strategist at the highest organizational level, having advised corporate management on issues relating to accounting, internal control and financial analysis.
- Proven management and leadership skills with the ability to provide clear direction to the department.
- An "in-the-trenches" mindset, willing to immerse self in the business and engaging decisions with a strategic, business centered orientation and the ability to prioritize and deliver on key initiatives.

| | |
|---|---|
| October 1996 To August 2000 | **Tubed Products, Inc., Easthampton, MA 01027** <br> Packaging Division of McCormick & Company Spices <br> *Finance Manager* |

- Responsible for guiding and supporting senior management in their understanding of the financial related activities in a manner designed to meet the planned profitability of a $100 million company.
- Provide business advice to members of the operations and sales groups to assist them in achieving profit and volume objectives.
- Contribute to company strategy and initiatives as a key member of the financial staff achieving an $11 million turnaround in operating profits and a $5 million reduction in excess and obsolete inventories.
- Responsible for the financial analysis of capital asset proposals to assure conformance with corporate policy and financial targets with the sound investment of a $7 million capital budget.
- Support the pricing committee by providing the necessary standard and actual costs needed to make sound pricing decisions enabling the company to exceed planned gross margins by 20 percent.
- Coordinated a cross functional team to implement procedures and guidelines to improve the collection and resolution of over $400 thousand in outstanding receivables.
- Work with the company's information systems department to develop financial information systems.
- Responsible for the development and update of the finance departments policies and procedures.
- Chairperson and Executive Committee member of the McCormick & Company Multiple Management Board. (Junior Board of Directors)

# CONFIDENTIAL RESUME

## James M. Plasse
19 Hillary Lane, Westfield, MA 01085
Home (413)-562-8708, Work (860)-684-5881 Ext. 202

June 1992      Spalding Sports Worldwide, Chicopee, MA 01021
to October 1996      *Senior Financial Analyst Manager*

- Responsible for the management of accounting staff to ensure an accurate month-end close for a $300 million U.S. Division.
- Interfaced computer software with financial reporting requirements to streamline manual financial processes.
- Provided financial information for various sales and marketing managers, and vice presidents on key business trends, ratios, and variances.
- Participated in monthly staff meetings to review system improvements, contingency plans, expense reduction plans, and financial results.
- Directly responsible for product line budgets, forecasting, and financial statement analysis.
- Monitored operating expenses, costs, margin analysis, and product line profitability.
- Reconciled domestic and international inventory, manufacturing, and procurement variances.
- Audited billing transactions to assure accuracy and conformance with company policy.

June 1988      **Ampad Corporation, Holyoke, MA 01040**
To June 1992      Division of Mead Paper & Company
     *Senior Cost Accountant*

- Responsible for all functions relating to cost accounting, budgets, and forecasting of a $200 million company.
- Coordinated all the manufacturing budgets for six manufacturing plants with $28 million in inventory.
- Supervised the daily accounting activities of three cost accountants, responsible for the monthly closing process, variance analysis, preparation of monthly financial statements and forecasts.
- Developed computer generated reports for tracking inventory waste, inefficiencies and material usage variances.
- Protected corporate assets with the development and implementation of sound financial policies and procedures.
- Participated in monthly staff meetings with senior management to review financial results, and corporate strategies for operational improvements.

May 1986      **Sealed Air Corporation, Holyoke, MA 01040**
To June 1988      *Plant Controller/Accounting Manager*

- Responsible for all plant accounting activities for two divisions of Sealed Air Corporation.
- Supervised the daily work activities of payroll, accounts payable, and accounts receivable departments.
- Responsible for product line budgets, fixed manufacturing and capital budgets, standard cost development, monthly closings, variance analysis, and monthly financial reporting.
- Prepared monthly profit and loss statements and variance analysis for a process cost environment.
- Assured optimum utilization of financial resources through sound forecasting and cash management.
- Audit responsibilities to assure accuracy and conformance with corporate policy.
- Coordinated annual external and internal audits including the annual physical inventory process.

**Relevant Experience**
**and Skills:**      Proficient in use of Excel, Microsoft Word, PowerPoint, Outlook, Hyperion, Lotus 123, Lotus Wordpro, Lotus Freelance, Ross General Ledger, Mapics\XA, and other PC\Network based systems.

**Education:**      M.B.A., Western New England College, Springfield, MA (Fall of 2001)
     B.A., Accounting, Westfield State College, Westfield, MA
     A.S., Business Administration, Holyoke Community College, Holyoke, MA
     A.S., Criminal Law, Holyoke Community College, Holyoke, MA

**References:**      Available upon request

July 26, 2000

Tyco Electronics
11 Tyco Drive
Stafford Springs, CT 06076

Dear Leslie:

I am enclosing my resume for the position of Controller (Ref Code TPCG Controller/Staff/Man) listed on Monster.com. I have held key financial manager positions for plastic packaging, specialty paper, and sporting goods manufacturing companies. In addition, I have extensive experience overseeing the budgeting process, month end closings, variance analysis, and financial reporting systems in a manufacturing environment.

Tyco, the world's largest supplier of electronic and electrical connectors, with combined sales of over $22 billion in fiscal 1999 is impressive.

I believe my qualifications closely parallel the requirements for the position and would appreciate meeting with you in person to discuss the position.

Please contact me at 413-562-8708 and I appreciate your confidentially.

Sincerely,

James M. Plasse

Friday @ 10:00am - 8/4/00
Tuesday @ 6pm 08/08/00

## CONFIDENTIAL RESUME

### James M. Plasse
19 Hillary Lane, Westfield, MA 01085
Home 413-562-8708, Work 413-529-1333

**Experience:**

October 1996
To Present

**Tubed Products, Inc., Easthampton, MA 01027**
Packaging Division of McCormick & Company Spices
*Financial Analysis Manager*

* Responsible for guiding and supporting senior management in their understanding of the financial related activities in a manner designed to meet the planned profitability of a $100 million company.
* Provide business advice to members of the operations and sales groups to assist them in achieving profit and volume objectives.
* Contribute to company strategy and initiatives as a key member of the financial staff achieving an $11 million turnaround in operating profits and a $5 million reduction in excess and obsolete inventories.
* Responsible for the financial analysis of capital asset proposals to assure conformance with corporate policy and financial targets with the sound investment of a $7 million capital budget.
* Support the pricing committee by providing the necessary standard and actual costs needed to make sound pricing decisions enabling the company to exceed planned gross margins by 20 percent.
* Coordinated a cross functional team to implement procedures and guidelines to improve the collection and resolution of over $400 thousand in outstanding receivables.
* Prepare and distribute weekly financial performance results and charts for the weekly staff meeting.
* Work with the company's information systems department to develop financial information systems.
* Responsible for the development and update of the finance departments policies and procedures.
* Chairperson and Executive Committee member of the McCormick & Company Multiple Management Board. (Junior Board of Directors)

June 1992
to October 1996

**Spalding Sports Worldwide, Chicopee, MA 01021**
*Senior Financial Analyst*

* Responsible for the management of accounting staff to ensure an accurate month end close for a $300 million U.S. Division.
* Interfaced available computer software with financial reporting requirements to streamline manual financial processes.
* Provided financial information for various sales and marketing managers, and vice presidents on key business trends, ratios, and variances.
* Participated in monthly staff meetings to review system improvements, contingency plans, expense reduction plans, and financial results.
* Directly responsible for product line budgets, forecasting, and financial statement analysis.
* Monitored operating expenses, costs, margin analysis, and product line profitability.
* Reconciled domestic and international inventory, manufacturing, and procurement variances.
* Audited billing transactions to assure accuracy and conformance with company policy.
* Reviewed disbursements for all inbound freight, duty, brokerage, bank charges, and custom fees applicable to inventory purchases.

## CONFIDENTIAL RESUME

### James M. Plasse
19 Hillary Lane, Westfield, MA 01085
Home 413-562-8708, Work 413-529-1333

---

**June 1988**     **Ampad Corporation, Holyoke, MA 01040**
**To June 1992**    **Division of Mead Paper & Company**
                   *Senior Cost Accountant*

- Responsible for all functions relating to cost accounting, budgets, and forecasting of a $200 million company.
- Lead a cross-functional team in the development and implementation of an activity based cost system.
- Coordinated all the manufacturing budgets for six manufacturing plants with $28 million in inventory.
- Supervised the daily accounting activities of three cost accountants, responsible for the monthly closing process, variance analysis, preparation of monthly financial statements and forecasts.
- Developed computer generated reports for tracking inventory waste, inefficiencies and material usage variances.
- Protected corporate assets through the development and implementation of sound financial policies and procedures.
- Participated in monthly staff meetings with senior management to review financial results, and corporate strategies for operational improvements.

**May 1986**      **Sealed Air Corporation, Holyoke, MA 01040**
**To June 1988**    *Plant Controller/Accounting Manager*

- Responsible for all plant accounting activities for two divisions of Sealed Air Corporation.
- Supervised the daily work activities of payroll, accounts payable, and accounts receivable departments.
- Responsible for product line budgets, fixed manufacturing and capital budgets, standard cost development, monthly closings, variance analysis, and monthly financial reporting.
- Prepared monthly profit and loss statements and variance analysis for a process cost environment.
- Assured optimum utilization of financial resources through sound forecasting and cash management.
- Audit billing transactions to assure accuracy and conformance with corporate policy and assist in setting relevant policy.
- Coordinated annual external and internal audits including the annual physical inventory process.

**Relevant Experience**
**and Skills:**     Proficient in use of Excel, Microsoft Word and Powerpoint, Lotus 123, Lotus Wordpro, Lotus Freelance, Ross General Ledger, Mapics\XA, and other PC\Network based systems.

**Education:**    M.B.A., Western New England College, Springfield, MA
                 B.A., Accounting, Westfield State College, Westfield, MA
                 A.S., Business Administration, Holyoke Community College, Holyoke, MA
                 A.S., Criminal Law, Holyoke Community College, Holyoke, MA

**References:**    Available upon request



**JAMES PLASSE**
FINANCIAL ANALYSIS MANAGER

TUBED PRODUCTS, INC.
44 O'NEILL ST.
EASTHAMPTON, MA 01027
TEL. 413-529-1333
FAX. 413-529-1291



McCORMICK PACKAGING GROUP



**SID AMASYA, CPIM**
DIRECTOR OF MATERIALS & LOGISTICS

TUBED PRODUCTS, INC.
44 O'NEILL ST.
EASTHAMPTON, MA 01027
TEL. 413-529-1333
FAX. 413-529-1290
Sid_Amasya@mccormick.com



McCORMICK PACKAGING GROUP



**C.J. NUSOM**
PLANT MANAGER

TUBED PRODUCTS, INC.
44 O'NEILL STREET
EASTHAMPTON, MA 01027
TEL. 413-529-1333
EMAIL: ClaudeNusom_IM@mccormick.com
FAX. 413-529-1290



McCORMICK PACKAGING GROUP